# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN

In re:

All-City Towing LLC, *et al*[1]                    Case No.: 26-20523-rmb

                Debtors.                                 Chapter 11

## MOTION TO REJECT EXECUTIVE CONTRACT WITH CINTAS CORPORATION FOR UNIFORMS AND FACILITY SERVICES

All-City Towing, LLC (the "Debtor"), hereby moves, pursuant to 11 U.S.C. § 365(a) and Fed. R. Bankr. P. 6006, to reject its executive contract with Cintas Corporation ("Cintas") for the rental of uniforms and facility services. The Debtor seeks to have its rejection effective as of February 1, 2026. In support of this motion, the Debtor states as follows:

### Jurisdiction

1. The Debtors, along with affiliated entities listed in footnote 1 below, filed their voluntary petition for relief under chapter 11 of the Bankruptcy Code on February 1, 2026 (the "Petition Date"). An order for relief was entered that same day.

2. The Debtors continue to manage their business and affairs pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

3. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1344(a) and 157(a), and the order of reference filed in this district entered pursuant to § 157(a).

---

[1] Jointly administered with Bret's Towing LLC, (Case No. 26-20524-rmb), ACT RE LLC, (Case No. 26-20525-rmb), Bret's RE LLC (Case No. 26-20526-rmb), OMS Properties LLC (Case No. 26-20527-rmb), 5408 S 13th LLC (Case No. 26-20528-rmb), 5414 S 13th LLC (26-20529-rmb), Daddy Jeff LLC (Case No. 26-20530-rmb), Mactire Services LLC (Case No. 26-20531-rmb), and Jeffrey Piller and Candice Brecht (Case No. 26-20532-rmb). This document relates only to All-City Towing, LLC (Case No. 26-20523-rmb).

4. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A). It concerns the administration of the Debtor's estate.

## Background on the Debtor's Business

5. The Debtor provides 24/7 towing, transportation, and roadside assistance to customers. The Debtor's principal operations and assets are at its facility located at 1213 W. Mallory Ave., Milwaukee, WI 53221.[2]

## Background on the Cintas Contract

6. The Debtor entered into a Rental Service Agreement with Cintas on May 4, 2021 (the "Contract"). Under the Contract, Cintas provides the Debtor with employee uniforms and other facility services. A copy of the Contract is attached as Exhibit A.

7. The Contract term is 60 months. The Contract is set to automatically renew for an additional term of 60 months unless the Debtor notifies Cintas in writing, no more than 180 days but no less than 90 days in advance of the expiration of the then current term, that the Debtor does not wish for the Contract to renew.

8. The current Contract term is set to expire on May 3, 2026, which is less than 90 days from the date of this motion. The Debtor did not notify Cintas within the aforementioned timeframe that it does not want the Contract to automatically renew. Accordingly, the Contract is set to renew for an addition 60-month term on May 4, 2026.

9. The Contract is paid weekly. The Debtor is spending anywhere between $750.00 and $850.00 a week under the Contract on uniforms, which doesn't include the payment of incidentals if uniforms are not returned when an employee is terminated.

---

[2] The Declaration of Jeffrey J. Piller in Support of the Debtors' First Day Motions, filed on the Petition Date in case no. 26-20523-rmb (Dkt. 7), provides detailed background information on the business and other factors at issue in the Debtor's bankruptcy case.

10. The Debtor has found a new uniform and facility services provider which operates an employer administered buy program for uniforms. With the new provider, the Debtor will pay for 50% of the uniform cost and the employee will pay the remaining 50%. Once the uniform is paid off, the employee will keep the uniform as opposed to having to return it upon employment termination. This will help reduce the incidental costs the Debtor currently incurs under the Contract.

11. After the high initial cost, the Debtor projects a weekly cost around $500.00 under the employer administered buy program, not to mention a much-reduced weekly incidental cost.

12. Rejecting the Contract will relieve the Debtor of the looming automatic 60-month renewal, permit the Debtor to reduce long-term operating costs specific to uniforms and facility services, and ultimately will create better cash flow for funding a plan to pay the Debtor's creditors.

**Applicable Law**

13. Section 365(a) of the Bankruptcy Code provides that a debtor-in-possession, "subject to the court's approval, may . . . reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). "This provision allows a trustee to relieve the bankruptcy estate of burdensome agreements which have not been completely performed." *Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996).

14. The standard applied to determining whether the rejection of an expired lease or executory contract should be authorized is the "business judgment" standard. *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1309 (5th Cir. 1985) ("It is well established that 'the question whether a lease should be rejected … is one of business judgment.'") (quoting *Grp. Of Institutional Inv'rs v. Chi. M., St. P. & P. R. Co.*, 318 U.S. 523 U.S. 523, 550 (1943); *In*

*re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (stating that a debtor's decision to reject an executory contract is governed by the business judgment standard and can only be overturned if the decision was the "product of bad faith, whim, or caprice").

15. The business judgment rule is crucial in chapter 11 cases and shields a debtor's management from judicial second-guessing. *See Comm. Of Asbestos Related litigants and/or Creditors v. Johns-Manville Corp.*, 60 B.R. 612, 615-16 (Bankr. S.D.N.Y. 1986) ("The Code favors the continued operation of a business by a debtor and a presumption of reasonableness attached to a debtor's management decisions.") Courts generally defer to a debtor-in-possession's business judgement to reject a lease or executory contract. *See, e.g., NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984), superseded by statute on other grounds, Bankruptcy Amendments and Federal Judgeship Act of 1984, sec. 541, § 1113, Pub. L. No. 98-353, 98 Stat. 333 (codified at 11 U.S.C. § 1113); *In re Minges*, 602 F.2d 38, 43 (2nd Cir. 1979); *In re Riodizio*, 204 B.R. 417, 424-25 (Bankr. S.D.N.Y. 1997); *In re G. Survivor Corp.*, 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994).

16. Rejection of an executory contract or unexpired lease is appropriate where such rejection would benefit the estate. *In re Whitcomb & Keller Mortg. Co.*, 715 F.2d 375, 379 (7th 1983) ("'[S]uccessful reorganization under Chapter 11 depends on relieving the debtor of burdensome contracts and pre-petition debts so that the 'additional cash flow thus freed is used to meet current operation expenses.'") Upon finding that a debtor exercised its sound business judgment in determining that rejection of certain contracts or leases is in the best interests of its creditors and all parties in interest, a court should approve the rejection under section 365(a) of the Bankruptcy Code. *See In re Summit Land Co.*, 13 B.R. 310, 315 (Bankr. D. Utah 1981) (holding the absent extraordinary circumstances, court approval of a debtor's decision to assume or reject an executory contract "should be granted as a matter of course").

### The Debtor's Business Judgment Supports Rejection of the Contract

17. After the initial cost of changing uniform providers, the Debtor calculates it will save between $250.00 and $350.00 a month long-term, not to mention the cost savings that will be realized on account of reduced incidental costs. These cost savings will reduce the Debtor's weekly/monthly expenditures, allow the Debtor to operate more efficiently, and ultimately will create better cash flow that can be used to pay off the Debtor's creditors.

18. Further, rejection of the Contract will relieve the Debtor of the Contract's looming automatic 60-month renewal, and any damages suffered by Cintas can be adequately addressed in the case. *See N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 531 (1984) ("Damages on the contract that result from the rejection of an executory contract … must be administered through bankruptcy and receive the priority provided general unsecured creditors.") The Debtor's decision to reject the Contract is based on sound business judgment, is not a product of bad faith, whim, or caprice, and should not be judicially second guessed.

### Conclusion

Wherefore, the Debtor requests the Court enter an Order authorizing the Debtor to reject the Contract with Cintas.

Dated: March 6, 2026.

*/s/ Tyler M. Jones*
Evan P. Schmit
Tyler M. Jones
Kerkman & Dunn

Proposed Attorneys for the Debtor

P.O. Address:

839 N. Jefferson St., Suite 400
Milwaukee, WI 53202-3744
Phone: 414.277.8200
Facsimile: 414.277.0100
Email: tjones@kerkmandunn.com

# RENTAL SERVICE AGREEMENT



## EXHIBIT A

| | |
|---|---|
| Service Location No. : | 0447 |
| MLRA/NA : | Account Number : |
| Contract No. : | Date : 05.04.2021 |
| Business Index : | Dynamics ID : 6cb6a597-08a1-eb11-a812-000d3a4f5ebc |

| Customer Name | DBA Name |
|---|---|
| **All City Towing** | **All City Towing** |
| Delivery Address: | Delivery Address Line 2: |
| **1213 Mallory Ave** | |
| City: | State / Province: | Zip / Postal Code: | Phone: |
| **Milwaukee** | **WI** | **53221** | **4145591820** |

*This agreement is effective as of the date of execution for a term of 60 months from the date of installation.

## Garments

| Garment | Frequency | Inventory | Unit Price |
|---|---|---|---|
| X59945<br>X59945-EVIS COMFORT PANT | Weekly | 11 | $ 0.70 |
| X65418<br>X65418-WK-SHRT/HI-VIS/ANSI3 | Weekly | 11 | $ 1.00 |
| X935<br>X935-COMFORT SHIRT | Weekly | 11 | $ 0.38 |
| X945<br>X945-COMFORT PANT | Weekly | 11 | $ 0.50 |

## Uniform Programs

| Program Description | Included: YES/NO | Per garment / per week |
|---|---|---|
| **Uniform Advantage** | YES | $ 0.10 |
| Uniform Advantage covers damaged garments needing to be replaced outside of normal wear. Uniform Advantage does not cover lost or unreturned garments. The Customer or Company may cancel Uniform Advantage at any time. | | |
| **Emblem Advantage** | YES | $ 0.09 |
| Emblem Advantage covers name and company emblems initially selected by Customer. The Customer or Company may cancel Emblem Advantage at any time after six months from the date of installation. | | |

| Program Description | Included: YES/NO | Per garment / per week |
|---|---|---|
| Premium Uniform Advantage | NO | $ 0.00 |
| Premium Advantage covers damaged garments needing to be replaced outside of normal wear. Premium Advantage does not cover lost or unreturned garments. The Customer or Company may cancel Premium Advantage at any time. | | |
| Prep Advantage | YES | $ 0.05 |
| Prep Advantage covers all cost associated with garment preparation. The Customer or Company may cancel Prep Advantage at any time after six month from the date of installation. | | |

## Uniform Charges

The additional charges below are subject to adjustment by Company effective upon notice to Customer, which notice may be in the form of an invoice. Pricing of emblems is valid for initial installation only.

| | |
|---|---|
| Name Emblem | $ 2.00 |
| Company Emblem | $ 4.00 |
| Custom Emblem 1 | $ 4.00 |
| | |
| Preparation Charge | $ 2.25 |
| | Per garment |
| Non-Standard Special Cut Garment (i.e., non-standard, non-stocked, unusually small or large sizes, unusually short or long sleeve or length, etc.) premium charges are per garment delivery. | |
| Non-Standard Special Cut Charge | $ 0.15 |
| FRC Non-Standard Special Cut Charge | $ 0.35 |
| Size Change Charge | $ 15.00 |
| Customer agrees to have employees measured by Cintas representative using garment \"size samples\". An additional charge per garment will be assessed for employees' size changed within 4 weeks of add-on or installation | |

## Facility Services

| Non-Garments / Services | Frequency | Inventory | Unit Price |
|---|---|---|---|
| X2160<br>X2160-SM SHOP TWL-RED | Weekly | 100 | $ 0.12<br>Auto LR :Yes/ Buy Back : No |

| Non-Garments / Services | Frequency | Inventory | Unit Price |
|---|---|---|---|
| X84335<br>X84335-3X5 BLACK MAT | Weekly | 2 | $ 3.75<br>Auto LR :No/ Buy Back : No |
| X84035<br>X84035-3X10 BLACK MAT | Weekly | 1 | $ 6.75<br>Auto LR :No/ Buy Back : No |
| X9024<br>X9024-CPULL DSP WHITE | Weekly | 1 | $ 0.00<br>Auto LR :No/ Buy Back : No |
| X9025<br>X9025-C PULL TOWEL RFL | Weekly | 5 | $ 10.00<br>Auto LR :No/ Buy Back : No |

# Auto LR Charge

| Item # | % of Inventory | Price |
|---|---|---|
| X2160 | 5 | $ 1.00 |

# Storage

| Charge Description | Per delivery |
|---|---|
| Lockers | $ 0.00 |
| Laundry Lock Up | $ 0.00 |
| Shop Towel Container<br>Free Liquid Statement. Under no circumstances will the Company accept textiles bearing free liquid. Shop towels may not be used to clean up oil or solvent spoils. | $ 0.00 |

# Payment Charges

COD Terms per delivery charge for prior service (If Amount Due is Carried to Following Delivery).

| Charge Description | Price |
|---|---|
| COD Term Charge | $ 6.00 |

# Other Charges

| Charge Description | |
|---|---|
| Service Charge<br>This Service Charge is used to help Company pay various fluctuating current and future costs including, but not limited to, costs directly or indirectly related to the environment, energy issues, service and delivery of goods and services, in addition to other miscellaneous costs incurred on that may be incurred in the future by Company. | $ 9.95 |
| Artwork Charge for Logomat | $ 0.00 |

# Agreement Provisions

| Description | Included: YES/NO |
|---|---|
| **Unilease**<br>All garments will be cleaned by Customer. | NO |
| **Linen Service**<br>Company will may make periodical physical inventories of items in possession or under control of Customer. | YES |
| **Hi-Vis Garments**<br>Customer receives Hi-Vis Garments. | NO |
| **Flame Resistant Garments**<br>Customer receives Flame Resistant Garments. | NO |
| **Direct Embroidery**<br>If service is discontinued for any employee, or Customer deletes any of the garments with the direct embroidery for any reason, or terminates this agreement for any reason or fails to renew this agreement, Customer will purchase all direct embroidery garments at then current replacement value. | |
| Customer certifies it **IS NOT** a federal, state or local government branch or agency | |
| Other: | |

# RENTAL SERVICE AGREEMENT
## BUY BACK AGREEMENT



Non-Standard Product / Special Size Garments

**Immediate**

| Customer Name | DBA Name |
|---|---|
| **All City Towing** | **All City Towing** |
| Delivery Address: | Delivery Address Line 2: |
| **1213 Mallory Ave** | |

| City: | State / Province: | Zip / Postal Code: | Phone: |
|---|---|---|---|
| **Milwaukee** | **WI** | **53221** | **4145591820** |

1. All City Towing (Customer) Orders from CINTAS CORPORATION ("Company") or any of its subsidiaries a garment rental service for employees requiring garments that are not standard to Company's normal rental product line.

2. In the event non-standard products are returned to Cintas for reasons other than normal wear, the Customer agrees to buy back all non-standard products assigned to that employee at the rate listed below as the buy back rate. In the event an employee requiring a special size garment discontinues the service for any reason, the Customer agrees to buy back the garment at the rates listed as buy back rate below. The Customer will be billed on the following week's invoice.

3. These garments taken out of service and purchased by the Customer will remain with the Customer. If the item can be reused by the Customer, the garment will be placed back in service and a credit will be issued for the value listed below as the buy back rate.

4. In the event the Customer deletes the non-standard product, alters the design of the non-standard product, below terminates the rental agreement or fails to renew the rental agreement, the Customer agrees to buy back all the remaining non-standard products that Company has in inventory in-service and out-of-service at the rate listed as buy back rate. Company may in its sole discretion elect to waive the buy back, in which case, Customer is obligated to return all garments to company in good and usable condition.

| Product Item # | Description | Buy Back Price |
|---|---|---|
| X65418 | X65418-WK-SHRT/HI-VIS/ANSI3 | $ 56.99 |

Customer
**Jeff Piller**
Owner
All City Towing
kyle.allcity2020@gmail.com

Sales Representative
**Michael James**
Cintas Corporation

# RENTAL SERVICE AGREEMENT
## AGREEMENT TERMS AND CONDITIONS



1. The customer, its successors and assigns ("Customer") orders from CINTAS CORPORATION or any of its subsidiaries, successors and assigns ("Company") all of the Customer's requirements of garment rental services and other items covered by this agreement during the term of this agreement all in accordance with the pricing, terms and conditions contained herein. Pricing is based on 52 weeks billing per rental item per year.

2. All garments and other rented items will be cleaned and maintained by Company and remain the property of the Company. Any garments that require replacement due to normal wear will be replaced by Company at no charge to Customer.

3. Unless specified otherwise, the garments supplied under this agreement are not flame retardant or acid resistant and contain no special flame retardant or acid resistant features. Flame retardant and acid resistant garments are available from Company upon request. Customer agrees to notify its employees that their garments are not designed for use in areas of flammability risk or where contact with hazardous materials is possible. Customer warrants that none of the employees for whom garments are supplied under this agreement require flame retardant or acid resistant clothing.

4. Customer agrees to notify Company, in writing, of any hazardous materials that may be picked up by Company in the soiled garments or other textiles serviced under this agreement. In no case will hazardous materials be present to the extent that they may be harmful to Company's employees.

5. If Company provides floor mats to Customer, Customer is ultimately responsible for choosing the type and placement of any floor mats provided by Company and ensuring floor safety locations at its location. If a mat needs to be replaced for any reason prior to its next scheduled service, Customer should remove it and contact Company to request replacement.

6. The weekly rental charge for any individual leaving the employ of Customer can be terminated, but only after all garments issued to that individual, or the current replacement value of same, have been returned or paid to Company. Any non standard, or special products (i.e., logo mats) must be purchased by the Customer if service is stopped for any reason. If items are lost or damaged by any means Customer will pay the then current replacement values for said items. Should Customer require garment sizes that are outside the standard size range, Customer agrees to pay the specific premium price for those items and sizes designated under Uniform Charges.

7. This agreement is effective as of the date of execution. The initial term of this agreement shall be as set forth on the front of this agreement and shall automatically renew for the same period of time unless Company is notified, to the contrary, in writing, no more than 180 days, but no less than 90 days in advance of the expiration of the then current term. Company has the right to increase prices. The Customer has the right to reject the increase within ten (10) days of the notice. If Customer rejects the price increase, Company may terminate this agreement. All invoices must be paid within ten days after the end of the month. Interest will accrue on any amounts which are not paid when due from the date due to the date of payment in full at an annual percentage rate equal to the lesser of (a) eighteen percent 18% or (b) the maximum rate permitted by applicable law.

8. Company is a licensee and not the owner of the Carhartt trademarked products. If Company should no longer have such license, then Company will substitute the Carhartt trademarked garments with garments of similar material and quality.

9. Customer hereby agrees to defend, indemnify and hold harmless Company from any claims and damages arising out of or associated with this agreement.

10. Company guarantees to deliver the highest quality textile rental service at all times. Any complaints about the quality of the service which have not been resolved in the normal course of business must be sent by registered letter to Company's General Manager. If Company then fails to resolve any material complaint in a reasonable period of time, Customer may terminate this agreement provided all rental items are paid for at the then current replacement values or returned to Company in good and usable condition.

11. Additional customer employees, products and services may be added to this agreement and shall automatically become part of and subject to the terms hereof this agreement, and subject to all of its provisions. If this agreement is terminated early, the parties agree that the damages sustained by Company will be substantial and difficult to ascertain. Therefore, if this agreement is terminated by Customer prior to the application expiration date for any reason other than documented quality of service reasons which are not cured as set forth above, or terminated by Company for cause at any time, Customer will pay to Company, as liquidated damages and not as a penalty, the greater of 50% of the average weekly invoice total multiplied by the number of weeks remaining in the unexpired term, or buy back all garments and other products allocated to Customer at the then current replacement values. Customer shall also be responsible for any unpaid charges on Customers' account prior to termination.

12. While this agreement is in effect, Customer agrees to pay a weekly minimum charge equal to 75% of (a) the charges on the initial invoice and (b) the charges for additional products and services added after the initial invoice.

13. Any dispute or matter arising in connection with or relating to this agreement shall be resolved by binding and final arbitration. The arbitration shall be conducted pursuant to applicable state or federal arbitration law. Any such dispute shall be determined on an individual basis, shall be considered unique as to its facts, and shall not be consolidated in any arbitration or other proceeding with any claim or controversy of any other party. The exclusive jurisdiction and forum for resolution of any such dispute shall lie in the state where Customer is located.

14. Customer certifies that Company is in no way infringing upon any existing contract between Customer and any other similar service provider.

15. This agreement contains the entire agreement of the parties with respect to the subject matter of this agreement and supersedes all prior negotiations, agreements and understandings with respect thereto. This agreement may only be amended, modified or supplemented by a written document executed by all parties, provided, however, if a Federal, state or local governmental body or its representative is a party to this Agreement, the proposed modification, amendment or supplement must be in writing signed by a President or Senior Vice President of Cintas.

16. If Company provides flame resistant clothing to Customer, Customer agrees it bears sole responsibility for selecting the flame resistant clothing and fabrics ("FRC") under this Agreement determining whether such items are appropriate for use by its employees and agents in their applicable work environment(s). CUSTOMER ACKNOWLEDGES THAT COMPANY HAS MADE NO REPRESENTATION, WARRANTY, OR COVENANT WITH RESPECT TO THE FLAME-RESISTANT QUALITIES OR OTHER CHARACTERISTICS OF THE FRC OR WITH RESPECT TO THEIR FITNESS OR SUITABILITY FOR THIS OR ANY OTHER PURPOSE. COMPANY MAKES NO REPRESENTATION WHETHER THE FRC CONSTITUTES APPROPRIATE PERSONAL PROTECTIVE EQUIPMENT FOR THE ENVIRONMENT(S) TO WHICH CUSTOMER'S EMPLOYEES OR AGENTS MAY BE EXPOSED OR AS TO THE FRC'S ABILITY TO PROTECT USERS FROM INJURY OR DEATH. Customer agrees to notify all employees and other agents of Customer who may wear or will be wearing the FRC that it is not designed for substantial heat exposure or for use around open flames. Customer acknowledges that compliance with any and all OSHA or other similar regulations or requirements relating to personal protective equipment is the sole responsibility of Customer. Further, Customer releases Company from any and all liability that results or may result from the use of the garments, including but not limited to any alleged failure of the FRC to function as flame-resistant or provide protection against fire and/or heat. Customer hereby agrees to defend, indemnify and hold harmless Company from any claims and damages arising out of or associated with this Agreement or resulting from Customer's or its employees' use of the FRC.

17. If Company provides high visibility garments to Customer, Customer bears sole responsibility for: (a) determining the level of visibility needed by wearers of the garments for their specific work conditions or uses: (b) identifying and selecting which garments meet the required level of visibility for any particular work conditions or uses; and (c) determining when garments require repair or replacement to meet the required level of visibility. If garment needs to be replaced outside of normal wear and tear, the customer will be charged the then current replacement value. Customer acknowledges and understands that the garments alone do not ensure visibility of the wearer. Customer further acknowledges that Company is relying upon Customer to determine whether any garments need repair or replacement to maintain the required level of visibility. Company represents only that the garments supplied satisfy certain ANSIIISEA standards to the extent the garments are so labeled. Customer acknowledges that Company has made no other representations, covenants or warranties whether express or implied, related to the garments.

18. IF CUSTOMER CHOOSES TO RENT MASKS FROM CINTAS, CUSTOMER ACKNOWLEDGES THAT PURSUANT TO OSHA REGULATIONS, 29 CFR 1910.132 (SUBPART I), AN EMPLOYER BEARS SOLE RESPONSIBILITY FOR SELECTING THE TYPE(S) OF PERSONAL PROTECTIVE EQUIPMENT TO BE USED BY ITS EMPLOYEES. ALL PURCHASERS OF PERSONAL PROTECTIVE EQUIPMENT FROM CINTAS BEAR FULL RESPONSIBILITY FOR SELECTING THE PPE APPROPRIATE FOR USE BY THEIR EMPLOYEES. CINTAS EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE. FURTHER, COMPANY MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, THAT THE MASKS CONTAIN ANY ANTIMICROBIAL, ANTIVIRAL, OR ANTIPATHOGENIC QUALITIES. THESE MASKS ARE NOT INTENDED FOR INFECTION PREVENTION OR REDUCTION OR RELATED USES; THEY ARE NOT RECOMMENDED FOR USE IN A SURGICAL SETTING OR WHERE SIGNIFICANT EXPOSURE TO LIQUID, BODILY, OR OTHER HAZARDOUS FLUIDS MAY BE EXPECTED OR FOR USE IN A CLINICAL SETTING WHERE THE INFECTION RISK LEVEL THROUGH INHALATION EXPOSURE IS HIGH. CUSTOMER RELEASES AND AGREES TO DEFEND, INDEMNIFY, AND HOLD HARMLESS CINTAS AND ANY/ALL OF ITS SUBCONTRACTORS, AGENTS, OFFICERS, EMPLOYEES, OR OTHER REPRESENTATIVES FROM LIABILITY FOR ANY AND ALL LOSS, DAMAGE, OR EXPENSE, UNDER ANY THEORY, THAT MAY OCCUR RELATED IN ANY WAY TO THE SUBJECT MATTER OF THIS AGREEMENT OR THE PRODUCTS PROVIDED.

19. IF CUSTOMER CHOOSES TO RENT FLAME RESISTANT FACE, NECK AND HEAD COVERINGS ("FR COVERINGS"), CUSTOMER AGREES IT BEARS SOLE RESPONSIBILITY FOR SELECTING THE FR COVERINGS COVERED BY THIS AGREEMENT AND DETERMINING WHETHER SUCH ITEMS ARE APPROPRIATE FOR USE BY ITS EMPLOYEES AND AGENTS IN THEIR APPLICABLE WORK ENVIRONMENT(S). CUSTOMER ACKNOWLEDGES THAT COMPLIANCE WITH ALL OSHA OR OTHER SIMILAR REGULATIONS OR REQUIREMENTS RELATING TO PERSONAL PROTECTIVE EQUIPMENT IS THE SOLE RESPONSIBILITY OF CUSTOMER. CUSTOMER ACKNOWLEDGES THAT CINTAS HAS MADE NO REPRESENTATION, WARRANTY OR COVENANT WITH RESPECT TO THE FLAME-RESISTANT QUALITIES OR OTHER CHARACTERISTICS OF THE FR COVERINGS. CINTAS MAKES NO REPRESENTATION WHETHER THE FR COVERINGS CONSTITUTE APPROPRIATE PERSONAL PROTECTIVE EQUIPMENT FOR THE ENVIRONMENT(S) TO WHICH CUSTOMER'S EMPLOYEES OR AGENTS MAY BE EXPOSED OR AS TO THE FR COVERINGS' ABILITY TO PROTECT USERS FROM INJURY OR DEATH. CUSTOMER AGREES TO NOTIFY ALL EMPLOYEES AND OTHER AGENTS OF CUSTOMER WHO MAY WEAR OR WILL BE WEARING THE FR COVERINGS THAT THEY ARE NOT DESIGNED FOR SUBSTANTIAL HEAT EXPOSURE OR FOR USE AROUND OPEN FLAMES.

20. CINTAS EXPRESSLY DISCLAIMS ALL IMPLIED WARRANTIES INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR PARTICULAR PURPOSE. FURTHER, COMPANY MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, THAT THE FR COVERINGS CONTAIN ANY ANTIMICROBIAL, ANTIVIRAL, OR ANTIPATHOGENIC QUALITIES. THESE FR COVERINGS ARE NOT INTENDED FOR INFECTION PREVENTION OR REDUCTION OR RELATED USES; THEY ARE NOT RECOMMENDED FOR USE IN A SURGICAL SETTING OR WHERE SIGNIFICANT EXPOSURE TO LIQUID, BODILY, OR OTHER HAZARDOUS FLUIDS MAY BE EXPECTED OR FOR USE IN A CLINICAL SETTING WHERE THE INFECTION RISK LEVEL THROUGH INHALATION EXPOSURE IS HIGH. CUSTOMER RELEASES AND AGREES TO DEFEND, INDEMNIFY, AND HOLD HARMLESS CINTAS AND ANY/ALL OF ITS SUBCONTRACTORS, AGENTS, OFFICERS, EMPLOYEES, OR OTHER REPRESENTATIVES FROM LIABILITY FOR ANY AND ALL LOSS, DAMAGE, OR EXPENSE, UNDER ANY THEORY, THAT MAY OCCUR RELATED IN ANY WAY TO THE SUBJECT MATTER OF THIS AGREEMENT OR THE PRODUCTS PROVIDED.

21. If Company provides rubber voltage gloves ("Gloves") or additional personal protective equipment ("PPE"), Customer assumes all risks and agrees it bears sole responsibility for selecting the Gloves and additional PPE and determining whether such items are appropriate for use by its employees and agents in their applicable work environment(s). CUSTOMER ACKNOWLEDGES THAT COMPANY HAS MADE NO REPRESENTATION WHETHER THE GLOVES OR ADDITIONAL PPE CONSTITUTE APPROPRIATE PERSONAL PROTECTIVE EQUIPMENT FOR THE ENVIRONMENT(S) TO WHICH CUSTOMER'S EMPLOYEES OR AGENTS MAY BE EXPOSED OR AS TO THE GLOVES' OR ADDITIONAL PPE'S ABILITY TO PROTECT USERS FROM INJURY OR DEATH. COMPANY MAKES NO REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE USEFUL LIFE OF THE GLOVES OR ADDITIONAL PPE, THAT THE GLOVES OR ADDITIONAL PPE HAVE BEEN TESTED OR CERTIFIED, OR THAT THE GLOVES OR ADDITIONAL PPE WILL PASS ANY SAFETY, SPECIFICATION, OR CERTIFICATION TESTS. COMPANY DOES NOT WARRANT THE GLOVES OR ADDITIONAL PPE WILL COMPLY WITH THE REQUIREMENTS OF ANY SAFETY CODE OR REGULATION OF ANY FEDERAL, STATE, MUNICIPALITY OR OTHER JURISDICTION. THE GLOVES AND ADDITIONAL PPE ARE SOLD AS IS. ALL WARRANTIES WHICH MAY ARISE BY IMPLICATION OF LAW, COURSE OF DEALING, OR USAGE OF TRADE (INCLUDING BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE) ARE EXPRESSLY EXCLUDED.

22. No agent, employee or representative of Company has authority to make any binding representation, affirmation of fact, or warranty (expressed or implied) with respect to the Gloves or additional PPE. Customer acknowledges that compliance with any and all OSHA or other safety regulations, including but not limited to satisfying the testing requirements under 29 CFR § 1910.137, is the sole responsibility of Customer. Further, Customer releases Company from any and all liability that results or may result from the use of the Gloves and additional PPE, including but not limited to any alleged failure of the Gloves and additional PPE to provide protection against electricity, fire, and/or heat. Customer hereby agrees to defend, indemnify and hold harmless Company from any claims and damages associated with the Agreement or resulting from Customer's or any other third party's use of the Gloves and additional PPE, including the negligence or other fault of Company. For any claims brought by employees of Customer, Customer expressly waives its immunity under applicable state workers compensation statutes.

23. By signing the agreement, Customer authorizes Cintas to check its credit to determine payment terms for this agreement.

24. By signing the agreement, Customer waives its signature as a requirement for services rendered. Customer agrees to pay all services in full without the signature on their weekly invoice(s). Customers with multiple weekly invoices have the option to waive their signature on all but one invoice or may waive their signature on all invoices. If Customer chooses to retain signature authority, the respective SSR must be able to contact the customer to obtain a delivery signature.   Single Invoice: Signature Waived Multiple Invoices: Signature Waived On All Cintas Location No: 0447

25. I agree that I am authorized to sign on behalf of the All City Towing.

26. This agreement is subject to the terms and conditions set forth in this agreement subject to Cintas GM approval. By signing below, Customer agrees to and accepts the terms and conditions set forth in this agreement.

| | |
|---|---|
| Customer<br>**Jeff Piller**<br>Owner<br>All City Towing<br>kyle.allcity2020@gmail.com | Sales Representative<br>**Michael James**<br>Cintas Corporation |